B25B (Official Form 25B) (12/08)
LAW OFFICE OF MARISSA SOTO
778 Castle Hill Avenue
Bronx, New York 10473
T:  (718) 931-2575
F:  (718) 931-1121
E:  Marissa.Soto@BXAdvocates.com

*Counsel for the Debtor*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
In re:                                            Chapter 11

Montezuma Mexican Restaurant Inc.        Case No. 15-10365(mg)

              Debtor.
---------------------------------------------------------X

*THE DEBTOR IN THIS CASE IS A SMALL BUSINESS. AS A RESULT, THE DEBTOR IS PERMITTED TO DISTRIBUTE AND HAS DISTRIBUTED THIS DISCLOSURE STATEMENT BEFORE ITS FINAL APPROVAL BY THE COURT. IF AN OBJECTION TO THIS DISCLOSURE STATEMENT IS FILED BY A PARTY IN INTEREST, FINAL APPROVAL OF THIS DISCLOSURE STATEMENT WILL BE CONSIDERED AT OR BEFORE THE HEARING ON CONFIRMATION OF THE PLAN.*

**MONTEZUMA MEXICAN RESTAURANT, INC.'S THIRD DISCLOSURE STATEMENT, DATED SEPTEMBER 20, 2017**

> Deleted: SECOND
> Deleted: 17

*Table of Contents*

# Contents

I. INTRODUCTION ........................................................................................................................... 3
    A. Purpose of This Document ............................................................................................. 3
    B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..................... 3
    C. Disclaimer ...................................................................................................................... 4
II. BACKGROUND ............................................................................................................................ 4
    A. Description and History of the Debtor's Business .......................................................... 4
    B. Insiders of the Debtor ..................................................................................................... 4
    C. Management of the Debtor Before and During the Bankruptcy .................................... 5
    D. Events Leading to Chapter 11 Filing .............................................................................. 5
    E. Significant Events During the Bankruptcy Case ............................................................ 5
    F. Projected Recovery of Avoidable Transfers ................................................................... 6
    G. Claims Objections .......................................................................................................... 6
    H. Current and Historical Financial Conditions .................................................................. 6
III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................................................................................ 6
    A. What is the Purpose of the Plan of Reorganization? ...................................................... 6
    B. Unclassified Claims ........................................................................................................ 7
    C. Classes of Claims and Equity Interests .......................................................................... 8
    D. Means of Implementing the Plan .................................................................................. 10
Post-Confirmation Directors will not receive compensation until all Plan payments contemplated herein have been made. The Reorganized Debtor will file quarterly operating reports. ........................................................................................... 10
    E. Risk Factors .................................................................................................................. 11
    F. Executory Contracts and Unexpired Leases ................................................................. 11
    G. Tax Consequences of Plan ............................................................................................ 11
IV. CONFIRMATION REQUIREMENTS AND PROCEDURES .................................................. 14
    A. Who May Vote or Object .............................................................................................. 14
    B. Votes Necessary to Confirm the Plan ........................................................................... 15
    C. Liquidation Analysis .................................................................................................... 15
    D. Feasibility ..................................................................................................................... 15
V. EFFECT OF CONFIRMATION OF PLAN ................................................................................ 16
    A. Discharge of Debtor ..................................................................................................... 16
    B. Modification of Plan .................................................................................................... 16
    C. Final Decree ................................................................................................................. 16
    D. Debtor Default ............................................................................................................. 16

**Deleted:** I. INTRODUCTION 3¶
A. Purpose of This Document 3¶
B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing 3¶
C. Disclaimer 4¶
II. BACKGROUND 4¶
A. Description and History of the Debtor's Business 4¶
B. Insiders of the Debtor 4¶
C. Management of the Debtor Before and During the Bankruptcy 5¶
D. Events Leading to Chapter 11 Filing 5¶
E. Significant Events During the Bankruptcy Case 5¶
F. Projected Recovery of Avoidable Transfers 6¶
G. Claims Objections 6¶
H. Current and Historical Financial Conditions 6¶
III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS 6¶
A. What is the Purpose of the Plan of Reorganization? 6¶
B. Unclassified Claims 7¶
C. Classes of Claims and Equity Interests 8¶
D. Means of Implementing the Plan 10¶
E. Risk Factors 11¶
F. Executory Contracts and Unexpired Leases 11¶
G. Tax Consequences of Plan 11¶
IV. CONFIRMATION REQUIREMENTS AND PROCEDURES 14¶
A. Who May Vote or Object 14¶
B. Votes Necessary to Confirm the Plan 15¶
C. Liquidation Analysis 15¶
D. Feasibility 15¶
V. EFFECT OF CONFIRMATION OF PLAN 16¶
A. Discharge of Debtor 16¶
B. Modification of Plan 16¶
C. Final Decree 16¶

# I. INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the small business chapter 11 case of **Montezuma Mexican Restaurant, Inc.** (the "Debtor"). This Disclosure Statement contains information about the Debtor and describes the **MONTEZUMA MEXICAN RESTAURANT, INC.'S THIRD PLAN OF REORGANIZATION** (the "Plan") filed by **Montezuma Mexican Restaurant, Inc.** on August 29, 2017. A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

[Deleted: SECOND]

The proposed distributions under the Plan are discussed at pages 5-12 of this Disclosure Statement. General unsecured creditors are classified in Class 4, and will receive a distribution of no less than 25% of their allowed claims over the next six years up to the amount of the total allowed claim.

### A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor, its operations, and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place thirty days from the date hereof or as soon thereafter as the Court's schedule allows, at 10:00 a.m., in Courtroom 523, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004.

2. *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to 778 Castle Hill Avenue, Bronx, New York 10473. See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by 4:00 p.m. on the date that is no less than nine days from the scheduled hearing on the confirmation of the plan or it will not be counted.

3. *Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtor, the United States Trustee, the Court, and to any other party who has requested notice in this proceeding by no later than the seventh day before the scheduled hearing to decide such matter.

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Marissa Soto, Esq., Law Offices of Marissa Soto, 778 Castle Hill Avenue, Bronx, New York 10473.

## C. Disclaimer

*The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

## II. BACKGROUND

### A. Description and History of the Debtor's Business

The Debtor is a Corporation. For approximately twenty years, the Debtor and its principals have been in the restaurant business, selling quality authentic Mexican food while providing a cozy and entertaining environment. Despite the extremely competitive business environment, the changing demographics of the Debtor's location, and the large number of cultural changes that have taken place over the years the Debtor has been operating, the Debtor has been able to maintain a loyal and consistent client base while attracting new clientele by instituting new programming to distinguish itself from competitors. The Debtor has been successful in this by focusing on consistent and high-quality food and providing a balance between a pleasing, family friendly restaurant atmosphere and an exciting social scene to attract younger clientele. The Debtor provides entertainment including, Karaoke Sundays, DJ entertainment during the week, and live musical performances on Fridays and Saturdays.

### B. Insiders of the Debtor

The Insiders, as such term is defined in §101(31) of the United States Bankruptcy Code (the "Code") of the Debtor are as follows:

| Name | Relationship | Prepetition compensation | Post petition compensation |
|---|---|---|---|
| Marcelino Dominguez | Majority Shareholder/Father of President | 1,800.00 | 0.00 |
| Magdalena Dominguez | Minority Shareholder/President | $1,800.00 weekly | $1,800.00 weekly |
| Fatima Dominguez | Manager/Sister of Minority Shareholder - President/Daughter of Majority Shareholder | $900.00 weekly | $900.00 weekly |
| Damaris Dominguez | Manager/Sister of Minority Shareholder - President/Daughter of Majority Shareholder | $700.00 weekly | $700.00 weekly |

| | | | |
|---|---|---|---|
| Edward Dominguez | Employee/Son of Majority Shareholder/Brother of Minority Shareholder | N/A | Per assignment |

### C. Management of the Debtor Before and During the Bankruptcy

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were Marcelino Dominguez, Magdalena Dominguez, Fatima Dominguez, Edward Dominguez, and Damaris Dominguez.

The Managers of the Debtor during the Debtor's chapter 11 case have been: Marcelino Dominguez, Magdalena Dominguez, Fatima Dominguez, and Damaris Dominguez.

After the effective date of the order confirming the Plan, the directors, officers, and voting trustees of the Debtor, or successor of the Debtor under the Plan (collectively the "Post Confirmation Directors"), will be: Marcelino Dominguez, Magdalena Dominguez, Fatima Dominguez, Edward Dominguez, Damaris Dominguez, and Manuel Franco, C.P.A. The responsibilities and compensation of these Post Confirmation Directors are described in section III.D of this Disclosure Statement.

### D. Events Leading to Chapter 11 Filing

The Debtor has been in business for over twenty years. The majority of those years were under the exclusive management of the owners, Marcelino Dominguez and Magdalena Dominguez. The Debtor's main location was always the West Kingsbridge location, however, the Debtor attempted to expand the brand to another location in Queens, New York. The new location was not successful. This required the Debtor to seek additional financing from the largest secured creditor in this case ("Jaquez"). Unfortunately, the Debtor was unable to save the Queens location and it was shut down.

In addition, a Wage and Labor complaint was filed against the Debtor and the Debtor was found liable. The case was settled for $452,569.67 which was due in a lump sum payment. In addition to the new location, the Debtor also hired a new manager for the Kingsbridge location, who took effective control over the majority of operations. It was under the new manager that the Debtor began to fall behind on its New York State tax obligations. The combination of the failing business in Queens, the Department of Labor, and the New York State Department of Finance debts left the Debtor bankrupt. The Debtor had no external source of funding and after conversations with the Debtor's secured lender, the Debtor decided it would be wise to file for Chapter 11 protection to allow the Debtor to restructure.

### E. Significant Events During the Bankruptcy Case

During the course of the bankruptcy case, the Debtor has continued its operations. The Debtor retained Manual Franco, C.P.A. to update bookkeeping system and to consult regarding cost cutting measures, plan of reorganization funding, and tighter internal controls. The Debtor initially retained David McGrail, Esq. as Debtor's counsel and later replaced Mr. McGrail with Marissa Soto, Esq. Over the course of the bankruptcy, the Debtor has attempted to cut costs while still maintaining the business quality that allowed the Debtor to stay in operation for so long. These measures included reducing the days when entertainment was offered, reducing the number of full time staff, adjusting restaurant price for inflation, and streamlining the menu and inventory to eliminate low performing high cost items.

In the initial months of the bankruptcy, the Debtor was at a standstill in negotiations with the holder of its largest secured claim. Such impasse lead the Debtor to file a motion to dismiss the case on February 17, 2016 ("Motion to Dismiss"). The Motion to Dismiss was objected to by Jaquez on March 11, 2016 ("Objection"). Debtor replied on March 22, 2016. In response to accounting issues identified in the Objection, Debtor filed amended operating reports on March 22, 2016. The Motion to Dismiss was adjourned on April 4, 2016 and ultimately withdrawn by stipulation and order on May 10, 2016.

On March 30, 2016, David McGrail, Esq. moved to withdraw as Debtor's counsel ("Motion to Withdraw"). On April 4, 2016, Marissa Soto, Esq. moved to be retained as Debtor's counsel ("Motion to Retain"). On April 6, 2016, the Court approved the Motion to Withdraw and the Motion to Retain.

Negotiations were reinitiated between the Debtor and Jaquez and continued throughout the summer of 2016. Shortly thereafter, negotiations between the Debtor and Jaquez broke down again.

On March 8, 2017, the United States Trustee filed its Motion to Dismiss or Alternatively, to Convert to Chapter 7. The hearing date for this motion was scheduled for April 6, 2017. The Debtor did not oppose the motion as there was no viable means by which a restructuring could be accomplished at that time. On the eve of the hearing, the Debtor and Jaquez were able to reach a tentative agreement, thereby resolving the United States Trustee's motion. The Debtor then reached out to the remaining creditors to arrive at a viable plan of reorganization.

On February 17, 2016, the Court entered an order granting McGrail's final fee application in the amount of $40,734.00 and expenses of $232.86. The fees were paid in full.

On August 29, 2017, Debtor's counsel filed an interim fee application seeking court authorization of its $25,840.00 in legal fees and $55.14 in expenses incurred from March 30, 2016 through August 24, 2017. The hearing on the interim fee application is scheduled for September 18, 2017 at 11:00 a.m.

### F. Projected Recovery of Avoidable Transfers

The Debtor has not yet completed its investigation with regard to prepetition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

### G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H. Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are listed in Exhibit B. Such valuation of the Debtor's leasehold interest was based on the appraisal of such property interest conducted by an independent appraiser. The valuation of the remaining Debtor assets is based on the opinion of their accountant Manual Franco, C.P.A.

The Debtor's most recent financial statements issued before bankruptcy, each of which was filed with the Court, are set forth in Exhibit C.

The most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case is set forth in Exhibit D.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B. Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has not placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | 0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | 0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court. | $30,000.00 | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | 0.00 | Paid in full on the effective date of the Plan |
| Other administrative expenses | 0.00 | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | $1,625.00 | Paid in full on the effective date of the Plan |
| TOTAL | $31,625.00 | |

2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| New York State Department of Taxation and Finance - Sales Tax and General Corporation Tax | $1,025.00 | 03/05/2015 | The holder of this Class 1 Priority Claim will be over a period not exceeding 5 years from the order of relief. |
| New York State Department of Labor | $14.36 | 07/27/2015 | The holder of this Class 1 Priority Claim will be paid over a period not exceeding 5 years from the order of relief. |

| | | | |
|---|---|---|---|
| United States Department of Internal Revenue - FICA | $11,614.74 | 03/18/2015 | The holder of this Class 1 Priority Claim will be paid over a period not exceeding 5 years from the order of relief. |
| New York City Department of Taxation and Finance - General Corporation Tax | $16,057.66 | 06/29/2015 | The holder of this Class 1 Priority Claim will be paid over a period not exceeding 5 years from the order of relief. |
| New York State Department of Taxation and Finance - Administrative Sales Tax | $5,346.55 | 09/29/2015 | The holder of this Class 1 Priority Claim will be paid over a period not exceeding 5 years from the order of relief. |

**C. Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.   *Classes of Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

| **Class #** | **Description** | **Insider? (Yes or No)** | **Impairment** | **Treatment** | |
|---|---|---|---|---|---|
| 2 | *Secure claim of:*<br>Name =  Jose Jaquez<br><br>Collateral Description = Lease, Inventory, machinery, equipment, tools, furniture, furnishings, leasehold improvements, good and any rights under lease to use such machinery, furnishings and equipment and those times of personal property and other tangible personal property<br><br>Allowed Secured Amount = $700,000.00<br><br>Priority of lien =  First<br><br>Principal owed = $700,000.00<br><br>Pre-pet. arrearage = $700,000.00<br><br>Total claim = $700,000.00 | No | Impaired | Monthly payment<br><br>Pmts Begin<br><br><br><br>Pmts End<br><br><br><br><br>Balloon pmt<br>Interest rate %<br><br>Treatment of Lien | = $8,333.33<br><br>= 1st of the Month following the Effective Date<br><br>=  Seventy-eighth month after first payment<br><br>= $50,000.00<br>= 0.00%<br>= Reinstated |

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment | |
|---|---|---|---|---|---|
| 3 | *Secure claim of:*<br>Name =  New York State Department of Taxation & Finance<br><br>Collateral Description =  Debtor's assets<br><br>Allowed Secured Amount = $226,605.85<br><br>Priority of lien =  Second<br><br>Principal owed = $226,605.85<br><br>Pre-pet. arrearage = $226,605.85<br><br>Total claim = $226,605.85 | No | Impaired | Monthly payment<br><br>Pmts Begin<br><br><br><br><br>Pmts End<br><br><br><br><br><br>Interest rate %<br><br>Treatment of Lien | = $3,755.51<br><br>= 1st of the Month following the Effective Date<br><br>= Seventy - second month after first payment<br><br>= 6%<br><br><br>= Reinstated |

2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 1 | Priority unsecured claim pursuant to Section 507(a)(8)<br><br>Total amount of claims = $ 34,058.31 | UnImpaired | Class 1 is impaired by this Plan, and each holder of a Class 1 Priority Claims will be paid in full in equal monthly installments paid over the five years following the Effective date of the Plan. |

3. *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of Class 4, which contains general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment | |
|---|---|---|---|---|
| 4 | General Unsecured Class | Impaired | Monthly payment | = $3,206.75 |
| | | | Pmts Begin | = 1st of the Month following the Effective Date |
| | | | Pmts End | = Seventy - second month after first payment |
| | | | Interest rate % | = 0.00 |
| | | | Estimated percent of claim paid | = 25% |

    4. *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 5 | Equity interest holders | Unimpaired | Reinstated |

**D. Means of Implementing the Plan**

    1. *Source of Payments*

Payments and distributions under the Plan will be funded by the following:

Ongoing operations of the Reorganized Debtor will provide the funding for payments and continuing distributions.

    2. *Post-confirmation Management*

The Post-Confirmation Reorganized Debtor will be managed on a daily basis by and their compensation, shall be as follows:

| Name | Affiliations | Insider (yes or no)? | Position | Compensation |
|---|---|---|---|---|
| Magdalena Dominguez | Minority shareholder | Yes | Head Manager | $1,800.00 weekly |
| Fatima Dominguez | Sister of minority shareholder | Yes | Manager | $900.00 weekly |

Post-Confirmation Directors will not receive compensation until all Plan payments contemplated herein have been made. The Reorganized Debtor will file quarterly operating reports.

### E. Risk Factors

The proposed Plan has the following risks:
- Actual revenue streams may be less than projected revenue streams in any of the following six years.
- Actual expenses may exceed projected estimates resulting in insufficient net profits for distribution purposes.
- The Reorganized Debtor may not be able to obtain a Lease extension.
- The competitive environment the restaurant operates in may change, resulting in reduced net profits available for distribution.
- The Reorganized Debtor may experience wage and labor violations again, resulting in unanticipated expenses.
- The Reorganized Debtor may become involved in litigation resulting from onsite injuries.

### F. Executory Contracts and Unexpired Leases

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is 30 days after Confirmation of the Plan.** Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G. Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action. The following are the anticipated tax consequences of the Plan and is for general information only. The tax treatment of a beneficial owner of a claim, may vary depending upon such claimholder's particular situation. This summary does not address all of the tax consequences.

TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING APPENDICES) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PUROPSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITEEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

*United States Federal Income Tax Consequences to the Debtors*

Cancellation of Debt and Reduction of Tax Attributes

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income. Settlement of a guarantee should not give rise to COD.

The Debtor should be able to utilize a special tax provision which excludes from income COD income attributable to discharged in a chapter 11 case (the "Bankruptcy Exception").

A Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses and net operating loss carryforwards (an certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception.

As a result of the required attribute reduction resulting from the discharge of indebtedness, to the extent the Debtor has any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account any income or gain resulting from implementation of the Plan, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtor may be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

*Limitation of NOL Carryforwards and Other Tax Attributes*

Under section 382 of the IRC ("Section 382"), if a corporation undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e. economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation does not continue is historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

As a result of the NOL carryovers, other tax attributes, and possible attribute reduction the Debtor could incur a federal income tax liability in connection with any income earned after the Effective Date.

*United States Federal Income Tax Consequences to Holders of Claim*

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan for its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attribution to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto when gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and is held for more than one year. Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

Holders of Allowed General Unsecured Claims

A Holder of Allowed General Unsecured Claims of a Debtor as of the Effective Date should be treated as receiving from that Debtor the Holder's share of the Creditor Proceeds (net of any applicable liabilities) of the relevant Class after distributions to Holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims of that Debtor in satisfaction of those Holders' Allowed claims. Accordingly, a Holder of such a Claim should generally recognize gain or loss in an amount equal to the amount of Cash received in the exchange less the adjusted tax basis of its Claim. It is possible that any loss, or a portion of the gain, realized by a Holder may be deferred until all of the distributions to such Holder are received. The amount of Cash received in respect of claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under this or her method of accounting.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the claim, (ii) the tax status of the Holder of the Claim, (iii) whether the claim has been held for more than one year, (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification provided is its correct number and that it is not subject to back up withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporation and financial institution. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to the regulation and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL, AND FOREIGN TAX LAW. THE DEBTOR OR ITS RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## IV.   CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes **2, 3, and 4** are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Plan Proponent believes that classes 1 and 5 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

      1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case was May 15, 2015.***

      2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

      3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

    holders of claims and equity interests that have been disallowed by an order of the Court;

    holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

    holders of claims or equity interests in unimpaired classes;

    holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

    holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

    administrative expenses.

*Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.*

    4. *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.  Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below.

    1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

    2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

**C. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

**D. Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

    1. *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit F.

2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information. Those projections are listed in Exhibit G.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of $ **186,179.14**. The final Plan payment is expected to be paid on the seventy-second month after Effective Date.

The Debtor is operating with a high cash balance and such balance will facilitate the cash demands of the proposed plan payments in the first five years. The Debtor will slowly restore its cash reserves by the final sixth year.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V. EFFECT OF CONFIRMATION OF PLAN
### A. Discharge of Debtor

<u>Discharge.</u> On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B. Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

Upon request of the Debtor, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

### D. Debtor Default

(a) The confirmed Plan is binding on every creditor whose claims are provided for in the Plan. Therefore, even though the automatic stay terminates on the Effective Date with respect to secured claims, no creditor may take any action to enforce either the pre-confirmation obligation or the obligation due under the Plan, so long as Debtor is not in material default under the Plan, except as provided below.

(b) Debtor's obligations under the Plan are separate with respect to each class of creditors. Default in performance of an obligation due to members of one class shall not by itself constitute a default with respect to members of other classes. For purposes of this Section 8, the holders of all administrative claims shall be considered to be a single class, the holders of all priority claims shall be considered to be a single class, and each non-debtor party to an assumed executory contract or lease shall be considered to be a separate class.

(c) Material Default Defined. If Debtor fails to make any payment, or to perform any other obligation required under the Plan, for more than 30 days after the time specified in the Plan for such payment or other performance, any member of a class affected by the default, party-in-interest, or United States Trustee may file and serve upon Debtor and Debtor's attorney (if any) a written notice of Debtor's default and request for entry of an order declaring default. If Debtor fails within 14 days after the date of service of the notice of default either (i) to cure the default; (ii) to file and service a motion for an extension of time to cure the default; or (iii) to file and serve a motion for a determination that no default occurred, then Debtor is in Material Default under the Plan to all the members of the affected class. If Debtor is in Material Default under the Plan, the complaining creditor may then submit its order declaring Material Default. The provisions of this paragraph do not preclude the United States Trustee from otherwise seeking an order to dismiss or convert the case for cause.

(d) Upon entry of the order declaring Material Default, any member of a class affected by the default: (i) may file and serve a motion to dismiss the case or to convert the case to Chapter 7; or (ii) without further order of the Bankruptcy Court, and may pursue its lawful remedies to enforce and collect Debtor's obligations under the Plan.

(e) The Bankruptcy Court retains jurisdiction over proceedings concerning: (i) whether Debtor is in Material Default of any Plan obligation; (ii) whether the time for performing any Plan obligation should be extended or modified; (iii) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan to be filed in this Court; (iv) whether the case should be dismissed or converted to one under Chapter 7; (v) any objections to claims; (vi) compromises of controversies under Fed. R. Bankr. Proc. 9019; (vii) compensation of professionals; and (viii) other questions regarding the interpretation and enforcement of the Plan.

**/s/** Magdalena Dominguez
**Montezuma Mexican Restaurant, Inc.**
[Signature of the Plan Proponent]

**/s/ Marissa Soto**
**Marissa Soto**
[Signature of the Attorney for the Plan Proponent]